# EXHIBIT I



**Baker & McKenzie LLP**

452 Fifth Avenue
New York, NY 10018
United States

Tel: +1 212 626 4100
Fax: +1 212 310 1600
www.bakermckenzie.com

**Asia Pacific**
Bangkok
Beijing
Brisbane
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta
Kuala Lumpur*
Manila*
Melbourne
Seoul
Shanghai
Singapore
Sydney
Taipei
Tokyo
Yangon

**Europe, Middle East
& Africa**
Abu Dhabi
Almaty
Amsterdam
Antwerp
Bahrain
Baku
Barcelona
Berlin
Brussels
Budapest
Cairo
Casablanca
Doha
Dubai
Dusseldorf
Frankfurt/Main
Geneva
Istanbul
Jeddah*
Johannesburg
Kyiv
London
Luxembourg
Madrid
Milan
Moscow
Munich
Paris
Prague
Riyadh*
Rome
St. Petersburg
Stockholm
Vienna
Warsaw
Zurich

**The Americas**
Bogota
Brasilia**
Buenos Aires
Caracas
Chicago
Dallas
Guadalajara
Houston
Juarez
Lima
Los Angeles
Mexico City
Miami
Monterrey
New York
Palo Alto
Porto Alegre**
Rio de Janeiro**
San Francisco
Santiago
Sao Paulo**
Tijuana
Toronto
Valencia
Washington, DC

\* Associated Firm
\*\* In cooperation with
Trench, Rossi e Watanabe
Advogados

December 22, 2022

Internal Revenue Service
GLDS Support Services
Stop 93A
Post Office Box 621506
Atlanta, GA 30362

**Re:  IRS Office of Chief Counsel Legal Advice
      <u>Freedom of Information Act Request</u>**

Dear Sir or Madam:

In accordance with the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, I request copies of all records in the possession, custody, or control of the Internal Revenue Service ("IRS") and the IRS Office of Chief Counsel relating to or referencing any and all of the following: (1) Chief Counsel Advice 202224010 (release date June 17, 2022); (2) Chief Counsel Advice 202119001 (release date May 14, 2021); (3) Chief Counsel Advice 201642035 (release date Oct. 14, 2016), and (4) Field Attorney Advice 20163701F (release date Sep. 9, 2016) (collectively, the "OCC Advice").[1]  I also request copies of all records in the possession, custody, or control of the IRS and the IRS Office of Chief Counsel relating to or referencing IRS Office of Chief Counsel employee Helen Hubbard's participation in: (1) an October 20, 2016, Practising Law Institute conference on corporate tax strategies in New York; and (2) a January 20, 2017, American Bar Association Section of Taxation - Financial Transactions meeting in Florida.

This request includes, but is not limited to, the following:

1.  All records related to or referencing the OCC Advice, including but not limited to the following items:

    a.  Requests for legal advice or assistance;

    b.  Requests for expedited treatment;

    c.  Response forms;

---

[1] The OCC Advice is attached as Exhibits A through D, respectively.



    d.  Notices of tentative conclusions;

    e.  Records prepared, assembled, or forwarded to assist in the understanding of relevant facts, transaction(s), or issues;

    f.  Records setting forth the issues upon which advice was being sought, relevant facts, law, or conclusions or proposed course(s) of action;

    g.  Requests for information;

    h.  Records relating to or referencing IRS Office of Chief Counsel's review of legal advice prepared by Field Counsel;

    i.  Background file documents; and

    j.  Communications within or between the IRS Office of Chief Counsel and the IRS regarding the OCC Advice.

2.  All records related to or referencing IRS Office of Chief Counsel employee Helen Hubbard's participation in: (1) an October 20, 2016, Practising Law Institute conference on corporate tax strategies in New York; and (2) a January 20, 2017, American Bar Association Section of Taxation - Financial Transactions meeting in Florida, including but not limited to the following items:

    a.  Notifications, forms, or requests related to or referencing the speaking engagements;

    b.  Notes prepared by or for Helen Hubbard related to or referencing the speaking engagements;

    c.  Records reviewed by Helen Hubbard to prepare for the speaking engagements; and

    d.  Communications within or between the IRS Office of Chief Counsel and the IRS related to or referencing Helen Hubbard's speaking engagements.



3.  To the extent not captured in the above requests, all records related to or referencing legal positions taken in the OCC Advice, including, but not limited to, all records related to or referencing the consideration of the Federal income tax treatment of termination or break fees and/or the application of I.R.C. §§ 162, 165, and/or 1234A to termination or break fees.

For purposes of this request, the terms "record" and "records" are used expansively and include, by way of illustration and without limitation, all agreements, contracts, communications, letters, reports, analyses, memoranda, e-mails (and attachments), instant messages, transcripts, minutes, notes, bulletins, worksheets, schedules, notebooks, drawings, photographs, drafts, diaries, calendars, workpapers, contracts, purchase orders, telecopies, telexes, or any information stored on optical disc, magnetic tape, microfilm or microfiche, or computer memory storage device. These terms also refer to all drafts or prior versions of records responsive to this request. All requests for records set forth herein are for records in their native electronic format, where applicable.

If it is determined that records, or any portions thereof, will not be disclosed, please provide me with the non-exempt records and with the non-exempt portions of the remaining records. In the event an exemption is claimed, please provide me with all segregable non-exempt portions of any withheld records pursuant to 5 U.S.C. § 552(b). When material is to be redacted, please "black out" rather than "white out" or "cut out" any portions for which an exemption is claimed.

If records responsive to this request have been destroyed, please identify the records destroyed, the date of destruction, and the person who destroyed the records.

Pursuant to 5 U.S.C. §§ 552(a)(6)(A)(i) and 552(b), if this request is denied either in part or in whole, please provide me with an index that specifies which exemption(s) is (are) being claimed for each portion of each record withheld. Please provide a detailed description of each record withheld, including the author(s) and any recipients, the date of its creation, its subject matter, its family members (if any), and its current physical location. In addition, please provide the reason that each record falls within the exemption claimed for it. Please also specify the number of pages in each record and the total number of pages that are responsive to this request. Such an index is required to allow me to evaluate the IRS's claims

3



that these records are exempt from disclosure.  *See, e.g.*, *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974).

In accordance with Treas. Reg. §§ 601.702(c)(4)(i)(H) and 601.702(f), I agree to pay reasonable charges incurred to search for and duplicate the requested records. Once the materials have been assembled, please advise me of the projected copying charges.

In accordance with Treas. Reg. §§ 601.702(c)(4)(i)(E) and 601.702(c)(5)(iii)(C), I establish my identity and right to access requested AbbVie Inc. ("AbbVie") records by the previously filed Power of Attorney and Declaration of Representative on Form 2848 executed by AbbVie, attached as Exhibit E.  A copy of my State of New York driver's license is attached for photo identification as Exhibit F.  AbbVie and I authorize you to send any of the above-mentioned records to:

Daniel A. Rosen
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
(212) 626-4272

In accordance with Treas. Reg. § 601.702(f)(3), I am a "commercial use requester" as defined in Treas. Reg. § 601.702(f)(3)(ii)(A).  As set forth in 5 U.S.C. § 522(a)(6)(A)(i), 31 C.F.R. § 1.4, and Treas. Reg. § 601.702(c)(9)(ii), I would appreciate a response to this request within twenty (20) working days of its receipt.

If you have any questions concerning this request or require further identifying information, please contact me at (212) 626-4272.

Thank you in advance for your consideration of this matter.

Sincerely,

Daniel A. Rosen
Daniel.Rosen@bakermckenzie.com

Attachments: Exhibits A through F

# EXHIBIT A

**Office of Chief Counsel**
**Internal Revenue Service**
# Memorandum

Number: **202224010**
Release Date: 6/17/2022

CC:FIP:ICFriedman
POSTF-119443-19

UILC:   1234A.01-00, 1001.00-00, 165.00-00, 263.08-03

date:   February 24, 2022

to:   Associate Area Counsel (                    )
(Large Business & International)
Attn:

from:   Ian C. Friedman
Attorney, Branch 1
(Financial Institutions & Products)

———————————————————————————————

subject:

This Chief Counsel Advice responds to your request for assistance. This advice may not be used or cited as precedent.

LEGEND

| | |
|---|---|
| Taxpayer | = |
| Target | = |
| | = |
| | = |
| Asset Buyer | = |
| Date 1 | = |
| Date 2 | = |
| Date 3 | = |
| Date 4 | = |
| $X | = |
| $Y | = |

ISSUE

Whether the termination fees Taxpayer paid to
                described below are treated as capital losses of Taxpayer under section

POSTF-119443-19                    2

1234A of the Internal Revenue Code (the "Code"), or whether Taxpayer properly claimed the fees as business expense deductions under section 162. In particular, this memorandum considers:

   (a) Whether there was a section 165 loss (rather than a section 162 expense) upon termination of each transaction;

   (b) Whether the Treasury Regulations accompanying section 263(a) provide that the termination fees are deductible under section 162 if the fees are not expressly capitalized by those regulations;

   (c) Whether case law pertaining to          terminations and the origin of the claim doctrine requires that the Service accept Taxpayer's treatment of the termination fees as section 162 expenses; and

   (d) If the terminations of the transactions resulted in section 165 losses to which section 1234A can apply, how section 1234A applies to those losses.

CONCLUSIONS

We conclude as follows:

   (a) Taxpayer's terminations of the transactions resulted in dispositions under section 1001 that gave rise to losses under section 165 rather than business expenses under section 162;

   (b) The regulations accompanying section 263(a) do not require that the termination fees be treated as section 162 expenses;

   (c) The case law pertaining to          terminations and the origin of the claim doctrine does not require that the Service accept Taxpayer's treatment of the termination fees as section 162 expenses; and

   (d) Section 1234A applies to characterize the section 165 losses that result from the terminations of the transactions as capital losses to the extent those losses were attributable to the termination of rights or obligations with respect to capital assets. As discussed below, Taxpayer's loss resulting from the termination of          is characterized as capital to the extent that loss was attributable to property that would have been capital assets in Taxpayer's hands, if Taxpayer had acquired that property pursuant to          . Taxpayer's loss resulting from the termination of the          is characterized as capital to the extent the property that Taxpayer would have sold pursuant to the          constituted capital assets of Taxpayer.

POSTF-119443-19                           3

FACTS


                                                                    dated as of
Date 1 ("        Agreement"), which provided for Taxpayer's acquisition of Target. If the
Merger Agreement had been carried out pursuant to its terms,




The                         provided that Taxpayer or Target could terminate              if,
                                ,
                                        ,                      was not consummated by a
specified date. If such a termination was triggered and certain other circumstances
existed, Taxpayer was required to pay Target a termination fee of $X.

On Date 2,


               ("              "). On Date 3,

                        . Shortly thereafter, due to the impracticability, if not impossibility, of
proceeding with           , Taxpayer and Target agreed to terminate the
Agreement and Taxpayer paid the termination fee of $X (the "        Termination Fee").
Because Taxpayer was the acquirer in the proposed transaction, the
Termination Fee paid by Taxpayer is commonly known as a "reverse" termination fee.[1]

While the                  was ongoing, in an effort to address          issues raised in
that litigation, Taxpayer entered into an                 Agreement with          Buyer,



               "). The              Agreement permitted the parties to
terminate           if the            Agreement was terminated by its terms. If the
          Agreement was terminated because the          Agreement was terminated,
the           Agreement provided that       Buyer became entitled to receive a
termination fee

---

[1] Where a        agreement sets forth break-up fees to be paid by a party seeking to terminate the
agreement, the fee to be paid by the target is known as the "termination fee," and the fee to be paid by
the acquirer is known as the "reverse termination fee." See Afra Afsharipour, "Transforming the Allocation
of Deal Risk Through Reverse Termination Fees," 63 Vand. L. Rev. 1161, 1163-64 (2010).

.

When Taxpayer and Target terminated the          Agreement, Taxpayer and Buyer executed a termination agreement in which Taxpayer agreed to pay the termination fee required by the          Agreement, which      was $Y ("                    Termination Fee").

Taxpayer reported the          Termination Fee and the          Termination Fee (collectively, the "Termination Fees") as ordinary business expense deductions under section 162 on its Form 1120, U.S. Corporation Income Tax Return, as filed. On audit, the Service is considering disallowing the ordinary business expense deductions and recharacterizing all or part of the Termination Fees as capital losses pursuant to sections 165 and 1234A.

Taxpayer's position is that section 1234A does not apply to the Termination Fees and Taxpayer is permitted business expense deductions for the Termination Fees under section 162.

LAW AND ANALYSIS

Whether the Termination Fees Taxpayer paid to terminate the          and the related          are treated as capital losses of Taxpayer under section 1234A, or whether Taxpayer properly claimed them as business expense deductions under section 162.

Section 1234A in relevant part provides:

> Gain or loss attributable to the cancellation, lapse, expiration, or other termination of—
>
> (1) a right or obligation . . . with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer, or
>
> (2) a section 1256 contract (as defined in section 1256) not described in paragraph (1) which is a capital asset in the hands of the taxpayer,

shall be treated as gain or loss from the sale of a capital asset.

Application of section 1234A begins with the plain language of the statute. See CRI-Leslie, LLC v. Commissioner, 882 F.3d 1026, 1033 (11th Cir. 2018), aff'g 147 T.C. 217 (2016). The plain language of section 1234A sets forth the following requirements in determining whether a transaction is subject to section 1234A(1):

(1) There is gain or loss attributable to an extinguishing event – (i.e., cancellation, lapse, expiration, or other termination);

(2) That event extinguishes a contractual right or obligation;

(3) The contractual right or obligation concerns underlying property that is a capital asset in the taxpayer's hands (or that would be a capital asset if the property were acquired by the taxpayer); and

(4) There is a "with respect to" nexus or connection between the right or obligation and the underlying capital asset.

With respect to the first two requirements, the            Agreement and the            Agreement created contractual rights and obligations for the Taxpayer and the other parties to those agreements. The rights and obligations in those agreements were extinguished by events within the scope of section 1234A:  the terminations of the agreements. Moreover, the payments of the Termination Fees and the tax consequences of those payments were attributable to those extinguishing events.

In sections a., b., and c. below, we explain that the termination of each agreement and the payment of the Termination Fee required by that agreement resulted in "gain or loss" and, accordingly, that the remaining element of the first two requirements for the application of section 1234A(1) was satisfied. In section d. below, we address how the remaining two requirements apply to the terminated rights and obligations in each transaction.

   a. Whether there was a section 165 loss (rather than a section 162 expense) upon termination of each transaction.

Section 1234A implicitly requires that there be a "gain or loss" in order for the gain or loss attributable to a cancellation, lapse, expiration, or other termination to be treated as "gain or loss from the sale of a capital asset." Section 1234A creates a deemed "sale of a capital asset," but contains no special definition of "gain or loss." Taxpayer argues that its payment of the Termination Fees resulted in section 162 expenses and that section 1234A applies to losses but not section 162 expenses.

As discussed in detail below, case law, a revenue ruling, and the regulations accompanying section 263(a) demonstrate that the facilitative costs of mergers and other similar major corporate transactions, including acquisitions or dispositions of assets constituting a trade or business, are required to be capitalized.[2] If the acquisition

---

[2] See Treas. Reg. § 1.263(a)-5(e); see also 67 Fed. Reg. 77701, 77706 (Dec. 19, 2002) (preamble to proposed regulations under section 263(a), providing that the rules in Rev. Rul. 99-23, 1999-1 C.B. 998, are being replaced with the rules set forth in the proposed regulations for ease of administration); T.D. 9107, 69 Fed. Reg. 436, 442-43 (Jan. 5, 2004) (preamble to final regulations under section 263(a), discussing modifications to the rules set forth in the proposed regulations).

POSTF-119443-19                        6

is terminated or abandoned, these facilitative costs are recovered as section 165 losses.[3]

Moreover, the legislative history of section 1234A reflects Congress's assumption that the making of a payment to terminate contracts with respect to capital assets results in the requisite gain or loss to apply the statute. The legislative history of the 1997 amendment of section 1234A also demonstrates Congress's intent that section 1234A as amended would apply to the making of a fixed payment to terminate a contract to acquire stock (or other capital assets).

For all these reasons, we conclude that terminations of the            Agreement and the            Agreement were dispositions of property for purposes of section 1001 that gave rise to gain or loss, and that Taxpayer's payments of the Termination Fees are taken into account in determining the amount of Taxpayer's losses from the dispositions of the agreements.[4]  For the same reasons, we conclude that the first two requirements for the application of section 1234A(1) were satisfied when the            Agreement and the            Agreement were terminated.

In Portland Furniture Mfg. Co. v. Commissioner, 30 B.T.A. 878, 881 (1934), the court allowed a deduction for an ordinary loss in the amount of the taxpayer's share of the expenses of investigating the feasibility of an abandoned merger. Rev. Rul. 73-580, 1973-2 C.B. 86, holds that the portion of the compensation paid by a corporation to its employees attributable to services performed in connection with corporate mergers and acquisitions must be capitalized; however, such amounts paid with respect to abandoned plans for mergers or acquisitions are deductible as losses in the year of abandonment. Treas. Reg. § 1.263(a)-5(d)(1), which post-dates Rev. Rul. 73-580, now provides that employee compensation (as defined in Treas. Reg. § 1.263(a)-5(d)(2)) is treated as an amount that does not facilitate a capital transaction set forth in Treas. Reg. § 1.263(a)-5(a). The preamble to the proposed regulations explains that the departure from the conclusion in Rev. Rul. 73-580 was made to provide a simplifying assumption to resolve much controversy between taxpayers and the Service, and to eliminate the burden on taxpayers of allocating certain transaction costs among various

---

[3] Deductions for abandonment losses are not specified in section 165. Treas. Reg. § 1.165-2(a), however, allows a deduction under section 165(a) for a loss incurred in a business (or in a transaction entered into for profit) and arising from the sudden termination of the usefulness in such business (or transaction) of any nondepreciable property, in a case where such business (or transaction) is discontinued or where such property is permanently discarded from use therein. Accordingly, merger and acquisition costs, otherwise capitalizable, are deductible losses under section 165 when the transaction is abandoned.

[4] We understand that Taxpayer capitalized facilitative transaction costs of the            and the            . The loss resulting from the termination of the            and the loss resulting from the termination of the            are each determined by taking into account both the Termination Fee paid to terminate the transaction and the Taxpayer's properly capitalized facilitative transaction costs of that transaction.

intangible assets.[5] This simplifying convention is intended to be a rule of administrative convenience, and not a substantive rule of law. The final regulations retained this simplifying convention, with several modifications that are not relevant to this discussion.[6] Accordingly, the general principle illustrated by Rev. Rul. 73-580, i.e., that facilitative expenses that would have to be capitalized to the transaction are deductible as losses if the transaction is abandoned, still holds.

Treas. Reg. § 1.263(a)-5(a) requires capitalization of costs that facilitate capital transactions. Treas. Reg. § 1.263(a)-5(a)(4) requires capitalization of costs in transactions involving a restructuring, recapitalization, or a reorganization of the capital structure of a business entity (including a reorganization described in section 368). Treas. Reg. § 1.263(a)-5(a)(2) requires capitalization of costs in transactions involving the acquisition by a taxpayer of an ownership interest in a business entity if, immediately after the acquisition, the taxpayer and the business entity are related within the meaning of Code sections 267(b) or 707(b). Treas. Reg. § 1.263(a)-5(a)(1) requires capitalization in cases involving an acquisition of assets that constitute a trade or business (whether the taxpayer is the acquirer or the target of the acquisition).

Treas. Reg. § 1.263(a)-5(e)(3)(iii) identifies a reorganization described in section 368(a)(1)(A), (B), or (C), and certain reorganizations described in section 368(a)(1)(D), as a "covered transaction". This designation requires that "inherently facilitative amounts" (as defined in Treas. Reg. § 1.263(a)-5(e)(2)) paid in the process of investigating or otherwise pursuing the reorganization be capitalized, regardless of whether the amount is paid for activities performed prior to the date determined under Treas. Reg. § 1.263(a)-5(e)(1), i.e., the date described in the regulations after which amounts paid in the process of investigating or otherwise pursuing a covered acquisition (or reorganization) are deemed to facilitate the transaction. See Treas. Reg. § 1.263(a)-5(e)(2).

Treas. Reg. § 1.263(a)-5 contemplates that the costs required to be capitalized by that section will be recovered as section 165 losses when the transactions are terminated or abandoned. Treas. Reg. § 1.263(a)-5(l), Example 3 provides that costs associated with evaluating "an acquisition by Z of a competitor, and an acquisition of Z by a competitor" must be capitalized and are recoverable by Z as losses under section 165 when Z abandons the acquisition transactions. Treas. Reg. § 1.263(a)-5(l), Example 4 requires that appraisal costs incurred in investigating the acquisition of certain targets be capitalized and are recovered as section 165 losses in the year the planned mergers are abandoned.

The case law dealing with the taxation of merger termination fees further supports the conclusion that Taxpayer's payments of the Termination Fees gave rise to section 165

---

[5] See 67 Fed. Reg. 77701, 77707 (Dec. 19, 2002) (explaining decision to treat employee compensation as not a facilitative cost and that this decision was part of a simplifying convention intended to be a rule of administrative convenience, and not a substantive rule of law).

[6] See T.D. 9107, 69 Fed. Reg. 436, 439-440 (Jan. 5, 2004) (discussing retention of simplifying conventions for employee compensation generally).

losses. In <u>Santa Fe Pac. Gold Co. v. Commissioner</u>, 132 T.C. 240 (2009), and <u>United States v. Federated Dept. Stores, Inc.</u>, 171 B.R. 603 (S.D. Ohio 1994), the taxpayer was the target of an unwanted (but ultimately successful) acquisition attempt. To try to prevent the acquisition, the taxpayer entered into a "white knight" merger agreement with a preferred partner. When the unwanted acquisition succeeded, the taxpayer in each case terminated the white knight agreement and paid a termination fee to the white knight.[7]

The issue in <u>Santa Fe</u> and <u>Federated</u> was whether the termination fee was deductible when the fee was paid and the white knight transaction was abandoned, or whether (as contended by the government) the taxpayer had to capitalize the fee to the hostile merger that actually occurred and account for that cost (for tax purposes) in connection with that subsequent transaction. The courts in both cases concluded that the merger termination fees were deductible currently under two Code sections, including section 165, when the white knight mergers were abandoned.[8] See <u>Santa Fe</u>, 132 T.C. at 276-79 (explaining that section 165 allows a current deduction for "costs associated with an abandoned capital transaction," stating that the merger termination fee was a "cost" of the abandoned merger, and concluding that the taxpayer was entitled to deduct the fee under section 165); <u>Federated</u>, 171 B.R. at 610-13 (stating that "[s]ection 165 allows a current deduction for costs associated with an abandoned capital transaction," that each corporation was presented with "two mutually exclusive capital transactions: a merger with the white knight or a merger with [the unwanted suitor]," and concluding that the break-up fees were costs incurred in abandoned transactions and therefore were currently deductible under section 165); see also <u>A.E. Staley Mfg. Co. v. Commissioner</u>, 119 F.3d 482, 490-92 (7th Cir. 1997) (concluding that most of taxpayer's failed efforts to prevent an unwanted (but ultimately successful) takeover attempt concerned "alternative capital transactions" whose costs were deductible as section 165 losses), <u>rev'g</u> 105 T.C. 166 (1995).[9] Moreover, the issue in this case is not only whether there is "loss" versus "expense" generally, but also the applicability of section 1234A to the termination. The courts in <u>Santa Fe</u> and <u>Federated</u> did not have to consider whether there was a "loss" (and not an "expense") for purposes of section 1234A because the transactions in those cases occurred before the 1997 amendment to section 1234A.[10] Accordingly, case law pertaining to terminated             agreements supports the

---

[7] The opinion in <u>Federated</u> considered merger termination fees paid by two corporations, each of whom was the subject of an unwanted takeover attempt and entered into a white knight merger agreement in an unsuccessful attempt to prevent that takeover.

[8] The courts in <u>Santa Fe</u> and <u>Federated</u> concluded that the white knight merger termination fees could also be deducted as section 162 expenses. As explained below in part c. of this memorandum, the rationale of those courts in concluding that the taxpayers could deduct the termination fees under section 162 is not applicable in this case.

[9] The Court of Appeals in <u>A.E. Staley</u> concluded that the costs of the alternative capital transactions could also be deducted as section 162 expenses. The Tax Court had concluded that the costs were capital expenditures and no deduction was allowable under either section 162 or section 165.

[10] The 1997 amendment is discussed in the text below at pp. 10-12.

treatment of merger terminations as dispositions of capital transactions that result in losses under section 165 to the payor of the termination fee.

Finally, the legislative history of section 1234A reflects Congress's assumption that the making of a payment to terminate contracts with respect to capital assets results in the requisite gain or loss to apply the statute. Section 1234A was enacted by section 507(a) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 333 ("1981 Act"). To address how Congress understood the phrase "gain or loss" when enacting section 1234A, we turn first to the legislative history from 1981, which explains:

> The definition of capital gains and losses in section 1222 requires that for gain or loss to be capital gain or loss, there must be a "sale or exchange" of a capital asset. Court decisions have interpreted this requirement to mean that when a <u>disposition</u> is not a sale or exchange of a capital asset, for example, a lapse, cancellation, or abandonment, the <u>disposition</u> produces <u>ordinary income or loss</u>. This interpretation has been applied even to <u>dispositions</u> which are economically equivalent to a sale or exchange of a capital asset. [Text omitted].

> The committee believes that the change in the sale or exchange rule is necessary to prevent tax-avoidance transactions designed to create fully-deductible [sic] ordinary losses on certain dispositions of capital assets, which if sold at a gain, would produce capital gain. . . . <u>The committee considers this ordinary loss treatment inappropriate if the transaction, such as settlement of a contract to deliver a capital asset</u>, is economically equivalent to a sale or exchange of the contract.

H. Rep. No. 97-201, at 212 (1981) (emphasis added; footnote omitted) [hereinafter "1981 House Report"]. The 1981 House Report further provides, as an example of a type of transaction that prompted enactment of section 1234A, the following straddle transaction composed of forward contracts referencing foreign currency or securities:

> Some of the more common of these tax-oriented ordinary loss and capital gain transactions involve cancellations of forward contracts for currency or securities. For example, a taxpayer may simultaneously enter into a contract to buy German marks for future delivery and a contract to sell German marks for future delivery with very little risk. If the price of German marks thereafter declines, the taxpayer will assign his contract to sell marks to a bank or other institution for a gain equivalent to the excess of the contract price over the lower market price and cancel his obligation to buy marks by payment of an amount in settlement of his obligation to the other party to the contract. <u>The taxpayer will treat the sale proceeds as capital gain and will treat the amount paid to terminate his obligation to buy as an ordinary loss.</u>

POSTF-119443-19                    10

1981 House Report at 213 (emphasis added). This example reflects Congress's understanding that making a payment to terminate a burdensome contract may give rise to a loss for tax purposes, which taxpayers were then treating as an ordinary loss in reliance upon case law and the limited "sale or exchange" language of section 1222. Congress enacted section 1234A to deem certain non-sale or exchange dispositions to be sales or exchanges to ensure that gain or loss from such dispositions had the same character as a gain or loss from selling the contract. Congress did not have to provide that a "gain or loss" arose from such dispositions in order to achieve uniform character because such dispositions already resulted in gain or loss prior to enactment of section 1234A.

In 1997, Congress amended section 1234A to apply it to a broader variety of transactions. As originally enacted in 1981, section 1234A applied to the termination of "a right or obligation with respect to personal property (as defined in section 1092(d)(1)) which is (or on acquisition would be) a capital asset in the hands of the taxpayer. . . ."[11] Section 1092(d)(1) at that time defined personal property to include only "personal property (other than stock) of a type which is actively traded . . . ."[12] The 1997 amendment broadened the scope of section 1234A by replacing the reference to "personal property (as defined in section 1092(d)(1))" with the word "property," thereby causing section 1234A to apply to the termination of a right or obligation with respect to any property that is (or on acquisition would be) a capital asset in the taxpayer's hands.[13]

The legislative history of the 1997 amendment, consistent with the legislative history from 1981, also confirms Congress' belief that, before the enactment of section 1234A, the termination of burdensome contracts with respect to capital assets resulted in losses, which some taxpayers were treating as ordinary losses. The 1997 legislative history further confirms that section 1234A was intended to provide that terminations of such contracts at an economic loss would result in losses that were capital losses, despite the absence of a sale or exchange. A Senate Report describing the 1997 amendment explains:

> There has been a considerable amount of litigation dealing with whether modifications of legal relationships between taxpayers is to be treated as a "sale or exchange." . . . Several court decisions interpreted the "sale or exchange" requirement to mean that a disposition, that occurs as a result of a lapse, cancellation, or abandonment, is not a sale or exchange of a capital asset, but produces ordinary income or loss.
>
> . . . .

---

[11] See sec. 507(a) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 333.

[12] In 1984, section 1092(d) was amended to include certain stock involved in straddle-type transactions in that section's definition of personal property. See sec. 101(b) of P.L. 98-369, Deficit Reduction Act of 1984, 98 Stat. 494, 618-19.

[13] See sec. 1003(a) of P.L. 105-34, Taxpayer Relief Act of 1997, 111 Stat. 788, 909-10.

> More recently, in <u>Stoller v. Commissioner</u>, 994 F.2d 855 (1993), the Court of Appeals for the District of Columbia held, in a transaction that preceded the effective date of section 1234A, that <u>losses</u> incurred on the cancellation of forward contracts to buy and sell short-term Government securities that formed a straddle were ordinary because the cancellation of the contracts was not a "sale or exchange."
> . . . .
>
> Courts have given different answers as to whether transactions which terminate contractual interests are treated as a "sale or exchange." This lack of uniformity has caused uncertainty to both taxpayers and [the Service] in the administration of the tax laws.

S. Rep. No. 105-33, at 132-35 (emphasis added) [hereinafter "1997 Senate Report"].[14] The legislative history from 1997 reaffirms Congress's concerns, expressed in 1981, that taxpayers could elect character through the form of disposition of an asset. The legislative history from 1997 further explains that Congress amended section 1234A to create more uniformity and certainty generally as to the character of transactions that terminate contractual interests.

The 1997 Senate Report, in describing how the amendment to section 1234A would affect specific transactions, explains as follows:

> An example of the second type of property interest that is affected by the committee bill is the forfeiture of a down payment under a contract to purchase stock. [footnote 81, citing <u>U.S. Freight Co. v. United States</u>, 422 F.2d 887 (Ct. Cl. 1970)]. The committee bill does not affect whether a right is "property" or whether property is a "capital asset."

1997 Senate Report at 135-36.

The case cited in the above-quoted language from the 1997 Senate Report (<u>U.S. Freight</u>) is of particular relevance in the present case because it also involved a fixed termination payment. In <u>U.S. Freight</u>, a taxpayer entered into a forward contract to acquire stock and paid part of the purchase price upfront. The contract provided that, if the taxpayer did not complete the sale, the seller would retain the fixed upfront payment as liquidated damages. The taxpayer became concerned that the contract price was unfavorable and terminated the burdensome contract, at which time the seller retained the upfront payment. The Court of Claims recognized that a contract with respect to a capital asset such as stock likely was itself a capital asset whose sale or exchange

---

[14] The parties in <u>Stoller</u>, a case cited in the legislative history, assumed that cancellation fees that the taxpayer paid upon termination of forward contracts resulted in "loss" from disposition of the contracts, and, thus, the only issue was whether the losses were ordinary or capital.

would produce capital gain or loss.[15] The court nevertheless concluded that the upfront payment gave rise to an ordinary loss rather than a capital loss because the termination of the contract was not a sale or exchange. Accordingly, the 1997 Senate Report is clear: Congress understood that the fact pattern in U.S. Freight was a disposition that generated gain or loss that would be covered by section 1234A, thereby overriding the result in that case and characterizing the gain or loss as capital because the disposition would be a deemed sale or exchange. More generally, the legislative history of section 1234A reflects Congress's understanding that terminations of contracts with respect to capital assets (such as the stock in U.S. Freight) were dispositions of the contracts, which would generate gain or loss for purposes of applying section 1234A.

For all of the above reasons, we conclude that Taxpayer's terminations of the _____ were dispositions of property within the meaning of section 1001. Upon termination, the Taxpayer was able to recover the _____ Termination Fee, the _____ Termination Fee, and the facilitative costs required to be capitalized by Treas. Reg. § 1.263(a)-5(a) as losses under section 165.

      b. Whether the Treasury Regulations accompanying section 263(a) provide that the Termination Fees are deductible under section 162 if the fees are not expressly capitalized by those regulations.

Taxpayer asserts Treas. Reg. § 1.263(a)-5(c)(8) provides that a fee paid to terminate a _____ can be deducted when paid unless the fee was paid to engage in a second, mutually exclusive capital transaction. Taxpayer infers that, if the Termination Fees are not expressly capitalized under the regulations accompanying section 263(a), then they must necessarily be deductible (as section 162 expenses) when paid.  We disagree.

Section 263(a)(1) provides that no deduction shall be allowed for amounts paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. Treas. Reg. § 1.263(a)-4 provides rules for applying section 263(a) "to amounts paid to acquire or create intangibles." See Treas. Reg. § 1.263(a)-4(a). Treas. Reg. § 1.263(a)-5 provides rules for applying section 263(a) to amounts paid "to facilitate" an acquisition of a trade or business, a change in the capital structure of a business entity, and certain other transactions. For this purpose, an amount is paid to facilitate one of the specified transactions "if the amount is paid in the process of investigating or otherwise pursuing the transaction." See Treas. Reg. § 1.263(a)-5(b)(1).

---

[15] See U.S. Freight, 442 F.2d, at 892 n.3 ("We consider the substance of our assumption for purposes of argument, that a contract right to purchase what would be a capital asset in the purchaser's hands is itself a capital asset, to be not only reasonable, but also the subject of authoritative support.") (citing Commissioner v. Ferrer, 304 F.2d 125 (2d Cir. 1962)). Although the court in U.S. Freight concluded that the forfeiture of the deposit for the purchase of stock was fully deductible as a loss under section 165(a), the court further explained that it "need not decide" whether the forfeited amount was deductible in the alternative under section 162, raising the possibility that the item could have been both a loss and an expense. U.S. Freight, 422 F.2d, at 896 n.8.

Treas. Reg. § 1.263(a)-5(c)(8)[16] considers when a fee paid to terminate an agreement to enter a transaction is a cost of facilitating another, subsequent transaction, and thus must be capitalized to the subsequent transaction. Under Treas. Reg. § 1.263(a)-5(c)(8), the fee to terminate the first transaction is a cost paid to facilitate the subsequent transaction, only if the transactions are mutually exclusive. Examples 13 and 14 of Treas. Reg. § 1.263(a)-5(l) illustrate this rule.

Treas. Reg. § 1.263(a)-5(c)(8) and Examples 13 and 14 of Treas. Reg. § 1.263(a)-5(l) do not address whether a termination fee paid is deductible under section 165 or section 162 when the requirements of Treas. Reg. § 1.263(a)-5(c)(8) are not applicable, which is the case here.

Section 263 and its regulations provide guidance as to when a taxpayer must capitalize an expense otherwise deductible (or subject to specific treatment) under another section of the Code such as sections 161 through 261. When section 263 and its accompanying regulations require capitalization, the taxpayer can only deduct (or otherwise account for) the expense when the terms of a Code section are satisfied (as is the case when a merger is terminated or abandoned allowing deduction of the capitalized expense as a section 165 loss). The preamble to the advance notice of proposed rulemaking that preceded the issuance of Treas. Regs. §§ 1.263(a)-4 and -5 states:

> A fundamental purpose of section 263(a) is to prevent the distortion of taxable income through current deduction of expenditures relating to the production of income in future taxable years. See Commissioner v. Idaho Power Co., 418 U.S. 1, 16 (1974). Thus, the Supreme Court has held that expenditures that create or enhance separate and distinct assets or produce certain other future benefits of a significant nature must be capitalized under section 263(a). See INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992); Commissioner v. Lincoln Savings & Loan Ass'n, 403 U.S. 345 (1971).
> . . . .
> Recently, much of the uncertainty and controversy in the capitalization area has related to expenditures that create or enhance intangible assets or benefits. To clarify the application of section 263(a), the forthcoming notice of proposed rulemaking will describe the specific categories of expenditures incurred in acquiring, creating, or enhancing intangible assets or benefits that taxpayers are required to capitalize. . . .
> . . . .
> The proposed standards and rules described in this document will not alter the manner in which provisions of the law other than section 263(a) (e.g.,

[16] Treas. Reg. §1.263(a)-4(d)(7)(ii) provides that Treas. Reg. §1.263(a)-4(d)(7)(i) does not apply to termination fees paid in connection with a transaction described in Treas. Reg. §1.263(a)-5(a), as is the case here. See also Example 4 of Treas. Reg. § 1.263(a)-4(d)(iii).

POSTF-119443-19                          14

> sections 195, 263(g), 263(h), or 263A) apply to determine the correct tax treatment of an item. Moreover, these standards and rules will not address the treatment of costs other than those to acquire, create, or enhance intangible assets or benefits . . . . [17]

The preambles to the proposed and final regulations similarly limit the scope of the issues addressed to amounts related to the creation or acquisition of intangible assets or to the facilitation of specified transactions.[18] In addition, with regard to termination costs, the preamble to the final regulations states:

> The final regulations clarify when costs of terminating a transaction described in § 1.263(a)–5 (including break-up fees) are treated as facilitating another transaction described in § 1.263(a)–5. . . . [A]n amount paid to terminate (or facilitate the termination of) an agreement to enter into a transaction described in the regulations is treated as facilitating another transaction described in the regulations only if the transactions are mutually exclusive and the agreement is terminated to enable the taxpayer to engage in the second transaction.[19]

Section 263 and its regulations require capitalization and thus deny current deductibility for an otherwise deductible expenditure. Once capitalized the expenditure is only recovered if the terms of a Code section are independently satisfied. In this case, section 165's terms were satisfied when the                          were terminated/abandoned, allowing Taxpayer losses equal to the                          Termination Fees and the facilitative costs required to be capitalized by Treas. Reg. § 1.263(a)-5(a).

For all these reasons, section 263 and its regulations do not control whether the Termination Fees are expenses under section 162 or losses under section 165, or (in the case of section 165 losses) otherwise limit the application of section 1234A to those losses.

> c. Whether case law pertaining to merger terminations and the origin of the claim doctrine requires that the Service accept Taxpayer's treatment of the Termination Fees as section 162 expenses.

---

[17] 67 Fed. Reg. 3461, 3462 (Jan. 24, 2002) (emphasis added).

[18] See the preamble to the proposed regulations under section 263(a), 67 Fed. Reg. 77701, 77701 (Dec. 19, 2002) ("[t]his document contains proposed regulations that explain how section 263(a) of the Code applies to amounts paid to acquire, create, or enhance intangible assets"); T.D. 9107, 69 Fed. Reg. 436, 436 (Jan. 5, 2004) ("the final regulations provide that an amount paid to acquire or create an intangible not otherwise required to be capitalized by the regulations is not required to be capitalized on the ground that it produces significant future benefits for the taxpayer, unless the IRS publishes guidance requiring capitalization of the expenditure").

[19] 69 Fed. Reg. at 441-42.

Taxpayer next argues that the case law discussed above pertaining to merger termination fees, and the origin of the claim doctrine, require that the Service accept Taxpayer's treatment of the Termination Fees as section 162 expenses.

Taxpayer's reliance upon the cases discussed above, <u>Santa Fe</u> and <u>Federated</u>, is misplaced. The threshold question in Taxpayer's case is whether the Termination Fees resulted in current "losses" under section 165(a)[20] to which section 1234A could apply, rather than business expenses under section 162. The merger cases cited by Taxpayer were primarily concerned with whether merger termination fees (i) were currently deductible under either section 162 or section 165 (or both) when the transaction with respect to which the fees were incurred was terminated, or (ii) instead were required to be capitalized and deferred under section 263(a) with respect to some subsequent transaction. They thus answered a question of timing rather than one of "expense" vs. "loss."[21] Nevertheless, as noted above, each of the cases supports our conclusion that a fee paid to terminate a proposed                     generates a loss under section 165(a) when the transaction is abandoned altogether.

As Taxpayer correctly notes, the courts in <u>Santa Fe</u> and <u>Federated</u> reached alternative conclusions under both section 162 and section 165: The courts concluded that the merger termination fees were deductible under section 162 because the fees fit within the rubric of expenses paid to defend an existing business against attack, and the courts alternatively concluded that the fees were deductible under section 165 as losses from abandoned capital transactions.[22] Taxpayer suggests that the alternative holdings in <u>Santa Fe</u> and <u>Federated</u> under sections 162 and 165 mean that its payments of the Termination Fees must properly be viewed as deductible expenses under section 162. The section 162 rationale in <u>Santa Fe</u> and <u>Federated</u>, however, is not applicable to the present case because the Termination Fees were not ordinary and necessary business

---

[20] Section 165(a) provides that "[t]here shall be allowed as a deduction any <u>loss sustained during the taxable year</u> and not compensated for by insurance or otherwise" (emphasis added). Treas. Reg. §1.165-1(b) provides that "a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and . . . actually sustained during the taxable year."

[21] In <u>Santa Fe</u> and <u>Federated</u>, the government argued that the cost of defending against an eventually successful hostile acquisition was required to be capitalized into the eventual acquisition under section 263(a), rather than currently deducted under either sections 162 or 165. The courts rejected the government's arguments, reasoning instead that the "white knight" or "alternative" transactions were not part of the eventual merger.

[22] The court in <u>Federated</u> found "that the bankruptcy court did not err in determining that the break-up fees were currently deductible under section 162 as ordinary and necessary business expenses," and further held in the alternative that "the break-up fees represent costs incurred in abandoned transactions" and that "therefore they are currently deductible under section 165." <u>Federated</u>, 171 B.R. at 610. The court in <u>Santa Fe</u> likewise held that the merger termination fee was deductible under section 162, and alternatively concluded that the taxpayer was entitled to a deduction for the merger termination fees under section 165 because "the termination fee was paid as a result of that [merger] abandonment and was therefore a cost of the abandoned merger . . . ." <u>Santa Fe</u>, 132 T.C. at 276, 278.

expenses of defending against unwanted attacks on Taxpayer's trade or business.[23]
Most importantly, as noted previously, the issue in this case is not only whether there is
"loss" versus "expense," but the impact of section 1234A on the termination – an issue
which was not in Santa Fe and Federated because the transactions in those cases
occurred before the 1997 amendment to section 1234A.[24] As explained above, the
legislative history of section 1234A demonstrates Congress's understanding that
making a payment to terminate a contract with respect to capital property would result in
a "loss" to which section 1234A could apply.

Lastly, Taxpayer argues that the Termination Fees are deductible as section 162
expenses because they were negotiated to compensate Target and         Buyer for
their transaction costs. This appears to be a reference to the origin of the claim doctrine,
under which courts analyze "the origin and character of the claim with respect to which
an expense was incurred" to determine its tax consequences. See United States v.
Gilmore, 372 U.S. 39, 49 (1963). Taxpayer provides little evidence that the Termination
Fees (other than a small portion of the            Termination Fee) were solely
intended to compensate Target and         Buyer for their current expenses, although
any such evidence would not affect our analysis under section 1234A. That a portion of
a Termination Fee may have compensated the payee for its own expenses does not
alter the fact that Taxpayer paid the Termination Fees to dispose of its rights and
obligations arising from capital transactions.[25]

---

[23] As noted above, the Court of Appeals in A.E. Staley similarly concluded that the costs of the taxpayer's
abandoned alternate (and defensive) capital transactions were deductible under section 162 and section
165. Like the section 162 conclusions in Santa Fe and Federated, the section 162 conclusion in A.E.
Staley was based on the rationale that the expenses were paid to defend an existing business against
attack.

The current regulations accompanying section 263(a) were not in effect when the transactions in Santa
Fe and Federated occurred. Under the current regulations, the termination fees paid would be capitalized
to the mergers that occurred. See Treas. Reg. § 1.263(a)-5(c)(8) and Treas. Reg. § 1.263(a)-5(l),
Example 13.

[24] As noted above, before the 1997 amendment, section 1234A could apply only to the termination of
rights or obligations with respect to personal property as defined in section 1092(d)(1). At the time of the
transactions in Santa Fe and Federated (as well as at the time of the transactions in A.E. Staley), the
definition of personal property in section 1092(d) was limited to personal property of a type that was
actively traded and generally excluded stock. Accordingly, it is unlikely that the terminations in those
cases could have involved rights or obligations with respect to property within section 1234A's scope at
that time. In any event, the courts in Santa Fe and Federated did not consider whether section 1234A
applied to the merger termination fees in those cases, nor did the courts in A.E. Staley consider whether
section 1234A applied to the costs of the alternative capital transactions in that case.

[25] As noted above, because Taxpayer was the acquirer, the            Termination Fee was a "reverse"
termination fee. The development of fixed reverse termination fees has raised the issue of valuing merger
agreements (from the acquirer's perspective) as comparable to discrete financial instruments. See Vijay
Sekhon, "Valuation of Reverse Termination Options in Mergers and Acquisitions," 7 Berkeley Bus. L.J.
72, 75 (2010) (explaining that similarity of transactions with reverse termination fee provisions to
European call options makes it possible to use a modified version of the Black-Scholes option pricing
formula to estimate the transaction's value to a merger acquirer). This lends further support to the
conclusion that the            Termination Fee is a cost of disposing of a type of contract to which section
1234A was intended to apply, rather than a section 162 expense.

The case law is clear: A taxpayer who makes a payment to terminate a ____ or similar transaction is disposing of a capital transaction and generally has a loss. We have seen no evidence in this case that would warrant our departure from this general rule.

> d. How section 1234A applies to the section 165 losses that result from the termination of the transactions.

As noted above, based on the plain language of section 1234A, there are four requirements in determining whether a transaction is subject to section 1234A(1):

(1) There is gain or loss attributable to an extinguishing event – (i.e., cancellation, lapse, expiration, or other termination);

(2) That event extinguishes a contractual right or obligation;

(3) The contractual right or obligation concerns underlying property that is a capital asset in the taxpayer's hands (or that would be a capital asset if the property were acquired by the taxpayer);[26] and

(4) There is a "with respect to" nexus or connection between the right or obligation and the underlying capital asset.

With respect to the first two requirements, the ____ Agreement and the ____ Agreement created contractual rights and obligations. The termination of those agreements resulted in the payment of the Termination Fees. Moreover, as we have just explained, the termination of those rights and obligations resulted in section 165 losses equal in value to the Termination Fees and the costs to facilitate the transactions required to be capitalized under Treas. Reg. § 1.263(a)-5(a). Accordingly, we now consider the third and fourth requirements, i.e., whether the rights and obligations embodied in the ____ Agreement and the ____ Agreement were with respect to property that either was a capital asset in Taxpayer's hands, or would have been a capital asset in Taxpayer's hands, if Taxpayer had acquired it.

The ____ . If the ____ had been consummated in accordance with its terms,


____ ). Though the ____ Agreement does not explicitly state the type of reorganization contemplated by the parties, it describes a transaction that was intended to qualify as a reorganization under section 368(a).

The ____ would have resulted in the acquisition of Target stock by Taxpayer. That transaction, viewed in isolation, would have given Taxpayer rights and obligations

---

[26] We note that, as used in section 1234A, the term "capital asset" does not include property described in section 1221(a)(2) (certain property used in the taxpayer's trade or business), even if the sale or exchange of that property would give rise to capital gain or capital loss under section 1231. See CRI-Leslie LLC, 882 F.3d at 1030.

with respect to Target stock—a capital asset in Taxpayer's hands, if Taxpayer had acquired it. However, immediately after the First Merger, Target would have merged with and into Merger Sub, LLC, a DE. Under step transaction principles, because the Second Merger was a step in an integrated plan that included the First Merger, the First Merger and Second Merger would have been treated as a single statutory merger of Target into Taxpayer which would have, if consummated, qualified as a reorganization under section 368(a)(1)(A) (an "A Reorganization"). See Rev. Rul. 2001-46, 2001-2 C.B. 321; Treas. Reg. § 1.368-2(b)(1)(iii), Example 2. Because an A Reorganization results in an asset acquisition by the acquiror, the          Agreement provided Taxpayer with rights and obligations with respect to Target's assets.

The          . The          Agreement was labeled          agreement and provided for the sale by Taxpayer to          Buyer of          . We have not seen any evidence that the          should be characterized for tax purposes in a manner different from its form. Accordingly, we believe the          involved rights and obligations to the          that Taxpayer would have sold pursuant to the          Agreement.

Application of Section 1234A. Applying the third and fourth requirements of section 1234A to the facts of this case as analyzed immediately above, Taxpayer's section 165 loss resulting from the termination of the          is treated as capital under section 1234A to the extent that loss is attributable to the property of Target that would have been capital assets in Taxpayer's hands if Taxpayer had acquired it. Similarly, Taxpayer's loss resulting from the termination of the          is treated as capital under section 1234A to the extent that loss is attributable to capital assets of Taxpayer that Taxpayer would have sold to          Buyer if the          had been consummated. The amount of          loss attributable to capital property may be determined by dividing the value of Target's property that would have been capital assets in Taxpayer's hands by the total value of Target's property that Taxpayer would have acquired and then multiplying the          loss by that fraction. Similarly, the amount of          loss attributable to capital property may be determined by dividing the value of Taxpayer's capital assets that it would have sold pursuant to the          by the value of all property that Taxpayer would have sold pursuant to that transaction and then multiplying the          loss by that fraction.[27] Cf. Watson v. Commissioner, 345 U.S. 544 (1953); Williams v. McGowan, 152 F.2d 570 (2d Cir. 1945) (for purposes of determining the character of gain or loss upon the sale of a business or other group of assets for a lump sum, the sale must be comminuted into its parts and the lump sum must be allocated among the individual assets based on their relative fair market values).

---

[27] As explained at n.26 above, capital assets for these purposes do not include property described in section 1221(a)(2), even if the sale or exchange of that property would give rise to capital gain under section 1231.

POSTF-119443-19                              19

<u>CASE DEVELOPMENT, HAZARDS AND OTHER CONSIDERATIONS</u>

This writing may contain privileged information. Any unauthorized disclosure of this
writing may undermine our ability to protect the privileged information. If disclosure is
determined to be necessary, please contact this office for our views.

Please call (202) 317-4451 if you have any further questions.


                              By:    _____
                                     Robert A. Martin
                                     Senior Technician Reviewer, Branch 6
                                     (Financial Institutions & Products)


        cc:  Robin Greenhouse
             Division Counsel
             (Large Business & International)

# EXHIBIT B

**Office of Chief Counsel**
**Internal Revenue Service**

# memorandum

Number: **202119001**
Release Date: 5/14/2021

CC:FIP:RAMartin
POSTS-107405-17

UILC: 6110.05-00

date: February 03, 2021

to: Area Counsel (Area 3)
(Large Business & International)
Attn: Dan Trevino, Senior Attorney, CC:LBI:3:CHI:1

from: Robert A. Martin
Senior Technician Reviewer, Branch 1
(Financial Institutions & Products)

subject:

This Chief Counsel Advice responds to your request for assistance. This advice may not be used or cited as precedent.

LEGEND

| | |
|---|---|
| Taxpayer | = |
| Target | = |
| State A | = |
| Date A | = |
| Date B | = |
| Date C | = |
| Industry | = |
| TPEntity 1 | = |
| TPEntity 2 | = |
| TPEntity 3 | = |
| TPEntity 4 | = |
| Amount A | = |
| B | = |
| Amount C | = |
| Amount D | = |
| E | = |

POSTS-107405-17                           2

F                    =
GGG                  =
H                    =
J                    =
K                    =
L                    =
Amount M             =


<u>ISSUES</u>

(1) Whether a                    fee                    that Taxpayer
                                        is treated as a
        I.R.C.
                    under I.R.C.

        (a) Whether there
                        the

        (b) Whether case law


                                        under section

        (c) Whether the Treasury Regulations accompanying I.R.C. §
                                    under section
                        and

        (d)                                    section        in this case, if applied
        in other cases,
                            under I.R.C.


(2) Whether the form of the proposed Transaction, which contemplated that
stock would be acquired by a newly formed subsidiary of Taxpayer
                        precludes application of section
        section



<u>CONCLUSIONS</u>

1. The Service is correct that
section        resulting in a                    With respect to Taxpayer's specific arguments,
we conclude that (a) there
                                        (b) the case

law pertaining to

POSTS-107405-17                                3

section        (c) the regulations accompanying section        do not require that the
be treated as                          section        and (d) the Service's
interpretation of section

section

2. The phrase
of section                                    The              provided
Taxpayer                                              We read the plain
language of section

to be completed.

<u>FACTS</u>

On Date A, Taxpayer, a publicly traded corporation incorporated in State A, and

a          publicly traded company

Also, on Date A, Taxpayer
and Target entered into

set forth the consideration that
shareholders would receive in exchange for their        stock under the proposed
Transaction, i.e.,                                      a
corporation.

."

explained Taxpayer's

the proposed Transaction, which included:

POSTS-107405-17                               4

Accordingly, on the date                          , Taxpayer's

                                                              The          directors
who held shares in                                                    at the
                          on the matter.

To facilitate the Transaction and pursuant to its obligations

                    among other entities, TPEntity 1 and TPEntity 2, both formed under
the laws of                    and TPEntity 3 and TPEntity 4, both formed as State A
limited liability companies.

               To accommodate this requirement, Taxpayer would have formed a
                                                       of TPEntity 1.  On
the closing date of the Transaction,

                                                 The
would have been implemented as follows:

                                                                              1

---

[1] The                          refers to          as "a newly formed Subsidiary of Taxpayer."

POSTS-107405-17                              5

2

The implementation of the Transaction had numerous conditions. In particular, these conditions included: The approval of the                              by the shareholders and the approval by the

3

Taxpayer reported
                                                                                                its
Form 1120, U.S. Corporation Income Tax Return, as-filed.  On audit, the Service

              I.R.C. §

---

2                              defines the term              of                              to include Taxpayer; the terms of the              are set forth at

3

POSTS-107405-17                                    6

Taxpayer's position is that section

                                                                                section


<u>LAW AND ANALYSIS</u>

Section


Application of section          begins with the plain language of the statute.  <u>See</u>

          The plain language of section          sets forth the following          requirements
in determining whether a transaction is subject to section


In determining whether to apply section

POSTS-107405-17                              7

In concluding that Taxpayer's

                                                      section

                                                                                    In

applying the plain language of section            the Service interpreted the phrase
          [4] as it is
           and that the common meaning of

Issue 1: Whether the                                            under section
                                                                 under section

          a. Whether there was

Section           implicitly requires that there be

                          Section

                          resulted in a section                 and that section
                          section

The legislative history of              reflects Congress' assumption that

                                                                to apply
the statute. Section

                                                      To address how
Congress understood the phrase            when enacting section       we turn
first to the legislative history         which explains:

_____
[4]

8

type                                                    further provides, as an example of a
                                                section          the following
                                                                 or securities:

                                                                            -

                                                This example reflects Congress's
understanding that

                                                                    of section
Congress enacted section

                                                Congress did not have to provide
that a
                                                        prior to enactment of section

POSTS-107405-17                              9


In        Congress amended section          to apply it
              As originally enacted in        section


Section            at that time defined
                                                    The
amendment broadened the scope of section


The legislative history of the        amendment, consistent with the legislative history
from        also confirms Congress' belief that, before the enactment of section

          which some taxpayers were treating                    The        legislative
history also confirms that section          was intended to provide that

                                          A Senate Report describing the
amendment explains:

                                                                          5

The legislative history from            reaffirms Congress' concerns, expressed in        that

---

[5] The parties in        a case cited in the legislative history, assumed that

POSTS-107405-17                    10

taxpayers could                                                          The
legislative history from         further explains that Congress amended section

The                         in describing how the amendment to section           would
affect                        explains as follows:

The case cited in the above-quoted language from the
          is of particular relevance in the present case because it also involved a
                          In                     a taxpayer entered

          The taxpayer became concerned that

          The Court

                              [6] The Court nevertheless concluded that the

_____

[6]

                                        Although the court concluded that
, the court further explained that it "need not decide" whether the

          raising the possibility that the item could have been

                                    .

11

                                                    Accordingly, the
clear: Congress understood that the fact pattern
                                        section          thereby overriding the
result in that case

Although                 did not concern a                              , courts have
treated
                                                                  and have
treated the
                                                            of section
          [7] Accordingly, we conclude that
                        meaning of I.R.C. §          which resulted in a
when it
                                                                  In doing
so, we note that Taxpayer's




                                                            set forth the
rationale for Taxpayer's




considerable value in the                  The                  Taxpayer saw
                                                            was not merely a
          itself.

_____

[7]




          We discuss this case law in more detail in our analysis under Issue 1.b. of this
memorandum.

POSTS-107405-17                          12

Our conclusion is consistent with the legislative history of section          which, by citing                                        indicates that Congress considered the

                                       and intended that section        apply to


      b. <u>Whether case law pertaining to</u>
<u>                                        supports Taxpayer's position that the</u>
<u>                                         under section</u>

Taxpayer next argues that the
    referring to three lines of cases, the first involving
    the second involving the
    , and a third involving the

Taxpayer first cites        cases involving the


                                        Taxpayer's reliance upon these cases is misplaced. The threshold question in the present case is whether the
                         under section        [8] to which section          could apply, rather than a
                         under section        The        cases cited by Taxpayer do not consider that distinction          under section        versus          under section
    Instead, they primarily concern whether
                                        under        section        or section        (or both) when the
    instead must be
                         Nevertheless, each of the cases cited by Taxpayers lends support for the Service's position that


In                   at issue was whether

                              section                when the

_____

[8]

were                                        section                        the court further concluded
that the

under section        that became

[9] Under the court's

analysis in                    Taxpayer's                                                    under
section        because it was the

The opinions in                and                      are even more applicable to the present case
than                    because they involve

In both          and                  the taxpayers were

The issue in                    and
was similar to the          issue that was addressed in

.[10] The courts rendered

---

[9] The                        took place before          expansion of the scope of section

[10] In                                            the government argued that the

under either sections          or    The courts rejected the government's
arguments, reasoning instead that the

POSTS-107405-17                                    14

section       and section       The courts concluded that the
under section       because the

and the
courts alternatively concluded that the                                    section
[11]

Taxpayer suggests that
under sections
and       mean that its

section       The section       rationale in            and
however, is not applicable to the present case because the

Rather, Taxpayer
. More importantly, the issue in this
case is whether there                        which was not in issue in those cases.
Given that the legislative purpose of section       was to

we disagree that
taxpayers can rely upon case law

. Section       requires that if the

_____

[11] The court in            found

and further held in the alternative

The
court in       likewise held that the            section       and alternatively concluded that the
taxpayer was

Neither  nor       considered whether section       could apply to
those cases occurred before the
amendment to section

POSTS-107405-17                            15

Taxpayer also cites other                    cases that           section            as authority for
its position that

                                                                    These are cases in which

taxpayers

                                                                    In both of these cases, the

courts concluded that the taxpayers should

                                                                    As discussed

previously, however, the                       cited              to clarify that

section          generally applies. Thus,                         have no bearing on the
applicability of section           in this case.

Lastly, Taxpayer argues that the

                                                                              under

section       because it was
This appears to be a reference to the

                to determine its tax consequences.
                        Taxpayer provides little evidence that the

                would not affect our analysis under section          . Taxpayer had

                                                                         .[12]

_____

[12] The development of

                          This lends further support to the notion that     which section
            a section

POSTS-107405-17                              16

was applicable in this case, we further note that the

[13] A

would fall squarely within section

The case law is clear: A taxpayer who makes

We have seen no evidence in this case that would warrant our departure from this general rule.

c. <u>Whether the Treasury Regulations accompanying section        provide that
under section </u>

The next authority Taxpayer relies on is Treas. Reg. §              Taxpayer asserts that this regulation provides that

Taxpayer further asserts that the Service is disregarding this regulation by

Thus, Taxpayer makes the inference that if the

---

[13] The use of

POSTS-107405-17                    17

Section

                              Treas. Reg. §           provides rules for applying
section                                              See Treas. Reg. §
            Treas. Reg. §           provides rules for applying section

                                        For this purpose, an

                                        See Treas. Reg. §


Treas. Reg. §              [14] considers when a

                              . Under Treas. Reg. §


     of Treas. Reg. §           illustrate this rule.

Treas. Reg. §                           of Treas. Reg. §
do not address whether                              section
section     when the requirements of Treas. Reg. §         are not applicable,
which is the case here. Section     and its regulations provide guidance on when

          under another section of the Internal Revenue Code (Code) such as
sections            .
                    of Treas. Regs. §§              states:

---

[14] Treas. Reg. §          provides that Treas. Reg. §1



                    See also       of Treas. Reg. §

POSTS-107405-17                               18

[15]

The preambles to the proposed and final regulations similarly

[16]  In addition, with regard to
the preamble to the final regulations states:

The final regulations clarify

.[17]

Contrary to Taxpayer's assertion, the Service is not disregarding Treas. Reg. §
                        or any other regulation. Treas. Reg. §                 does not control whether

---

[15]

[16] See the preamble to Proposed Treas. Regs. §§

17

POSTS-107405-17                         19

                              section                         section
                                        section

        d. Whether the Service's interpretation of section          in this case, if applied in
        other cases, will allow

                                        section

Taxpayer makes the hypothetical argument that if the Service applies section

                                                        under section
which would be a result that Congress did not intend by amending section
        Given that Taxpayer's argument is not actually at issue, we can only offer a
general analysis of how section
                                                                                The
actual application of section        in a given case would be specific to each taxpayer
and transaction.

Section          provides as follows:

                        18

────────────────────────────
18

POSTS-107405-17                          20

For these reasons, section          has no apparent applicability to
                                              even under the Service's approach in
applying section

Issue 2: Whether the phrase in section
                 means that the


Taxpayer argues that section          cannot apply to


                                              Taxpayer reads section
                                                        to mean that a
taxpayer


                                              Taxpayer
maintains that the Service is asserting that section          can be applied on a
                              or that the Service is otherwise
                 section          applicable in this case.[19]

Taxpayer is incorrect. By its express terms, section          applies when a taxpayer's


                              Contrary to Taxpayer's assertions, the plain
language of section


                 The facts of this case satisfy those statutory requirements, and the Service
need not adopt

                                                        section          in this case.

The Service's interpretation of section          in this manner is likewise consistent with
general principles

_____
19

POSTS-107405-17                     21

In this case, Taxpayer

Taxpayer had

because                          that the Transaction
was of strategic value to Taxpayer and its shareholders.

Additionally, if Taxpayer's arguments were accepted, section        would be rendered

This further
supports the Service's conclusion that section         can apply to a taxpayer that has

We note that the
Service is not contending that Taxpayer

.[20]  Rather, the Service instead contends that, if
Taxpayer's position were accepted, the statute

that expanded the scope of section        explains that
the amendment was intended to apply

and make
the tax results more uniform.[21]  Section         is not limited to tax-avoidance

---

[20] On the other hand, under Taxpayer's interpretation

[21] The legislative history of the        amendment to section        makes clear that eliminating the ability
Establishing clearer rules
for the taxation                        was another.  See, e.g.,

POSTS-107405-17                            22

transactions in which a taxpayer intended from the

In accordance with the plain language of section

                                                        In applying the

phrase                    the Service uses its ordinary meaning, i.e

                                                   Accordingly, the

fact that Taxpayer and Target

                has no bearing on whether section          applies to

<u>CASE DEVELOPMENT, HAZARDS AND OTHER CONSIDERATIONS</u>

This writing may contain privileged information.  Any unauthorized disclosure of this writing may undermine our ability to protect the privileged information.  If disclosure is determined to be necessary, please contact this office for our views.

Please call                    if you have any further questions.

                        By:  _____
                             Robert A. Martin
                             Senior Technician Reviewer, Branch 1
                             (Financial Institutions & Products)

_____

POSTS-107405-17                    23

cc:

-

# EXHIBIT C

**Office of Chief Counsel**
**Internal Revenue Service**
# Memorandum

Number: **201642035**
Release Date: 10/14/2016

CC:ITA:B01:CMGlendening
POSTN-133450-15

UILC:   1234A.00-00, 165.00-00, 1222.00-00

date:   February 09, 2016

to:   David Q. Cao
      Senior Counsel (Houston)
      (Large Business & International)

from:   Andrew M. Irving
        Senior Counsel, Branch 1
        Office of Associate Chief Counsel
        (Income Tax & Accounting)

---

subject:   Receipt of merger termination fee

This memorandum responds to your October 5, 2015, request for advice.


ISSUES

1. Under the circumstances discussed below, how is gain or loss determined by a taxpayer who incurs expenses investigating an acquisition of stock, and also receives a fee for the termination of an agreement between the taxpayer and a target corporation pursuant to which the parties agree to undertake a series of steps designed to lead to the taxpayer's acquisition of the target corporation's stock?

2. Whether, under the circumstances discussed below, section 1234A applies to the gain or loss realized?

CONCLUSIONS

1. Under the circumstances discussed below, gain or loss is determined by reducing any fee received for the termination of the agreement by any costs incurred in the process of investigating and pursuing the transaction that were properly capitalized under section 1.263(a)-5(e) of the Income Tax Regulations.

2.  Under the circumstances discussed below, section 1234A applies to the gain or
    loss realized by the taxpayer.


FACTS

_Situation 1_

A domestic corporation ("Acquirer") enters into an agreement ("Contract") with another
corporation ("Target") pursuant to which the parties agree to undertake a series of steps
that are designed to lead to Acquirer's acquisition of Target's stock.  At the time that the
Contract is entered into, Target's stock is publicly traded on an established exchange.

The Contract is a bilateral agreement that requires both Acquirer and Target to pursue a
plan of merger by making best efforts to effectuate Acquirer's proposed stock
acquisition through a merger of a newly formed, wholly owned subsidiary of Acquirer
with and into Target, including by recommending the deal to their respective
shareholders and obtaining required governmental approvals.

Regarding Target's obligations under the Contract, the Contract requires Target to
recommend to its shareholders that they approve the plan of merger, subject to the
receipt of a superior offer.  The Contract provides that Target may terminate the
contract upon (i) entering into another agreement based on a superior offer, (ii) a
rejection of Acquirer's offer by Target's shareholders, or (iii) a failure to obtain approval
of Target's shareholders by a certain date.  The Contract provides that in the event the
Contract is terminated due to one of the foregoing, Target must pay a termination fee of
$1,000,000 to Acquirer.

Target receives a superior offer from an unrelated company and enters into another
agreement with the company making the superior offer.  As a result, Target terminates
the Contract and pays Acquirer the $1,000,000 termination fee.  At the time the Contract
is terminated, Acquirer has incurred $200,000 of costs in the process of investigating
and pursuing the transaction that Acquirer properly capitalized as costs of facilitating the
proposed transaction under section 1.263(a)-5(e) of the Income Tax Regulations.

_Situation 2_

The facts are the same as in _Situation 1_, except that Acquirer incurs costs in the amount
of $1,100,000 that Acquirer properly capitalized as costs of facilitating the proposed
transaction under section 1.263(a)-5(e) of the Income Tax Regulations.

APPLICABLE LAW AND ANALYSIS

Section 1222 provides that capital gain or loss is gain or loss from the sale or exchange of a capital asset.

Section 1221 defines a capital asset as property held by the taxpayer, with certain exceptions.

Section 1234A(1) of the Code provides that gain or loss attributable to the cancellation, lapse, expiration or other termination of a right or obligation with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer is treated as gain or loss from the sale of a capital asset.

The legislative history to section 1234A provides that the Committee believed that the law as it existed was deficient because it "taxes similar economic transactions differently," and "its lack of certainty makes the tax laws unnecessarily difficult to administer."  S. Rept. No. 105-33, at 134, 1997-4 C.B. (Vol. 2) at 1214.  The legislative history to section 1234A further provides that—

> …[a] major effect of the Committee bill would be to remove the effective ability of a taxpayer to elect the character of gains and losses from certain transactions. Another significant effect of the Committee bill would be to reduce the uncertainty concerning the tax treatment of modifications of property rights.

S. Rept. No. 105-33, at 135, 1997-4 C.B. (Vol. 2) at 1215.  The explanation of the provision provides further that—

> …[t]he bill extends to all types of property the rule which treats gain or loss from the cancellation, lapse, expiration, or other termination of a right or obligation with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer [as capital gain or loss]….Thus, the committee bill will apply to (1) interests in real property and (2) non-actively traded personal property….An example of the second type of property interest that is affected by the committee bill is the forfeiture of a down payment under a contract to purchase stock.  See *U.S. Freight Co. v. U.S.* 422 F.2d 887 (Ct. Cl. 1970), holding that forfeiture was an ordinary loss.

S. Rept. No. 105-33, at 135, 1997-4 C.B. (Vol. 2) at 1215.
Section 1.263(a)-5(e) of the regulations provides that amounts paid in the process of investigating or otherwise pursuing certain acquisitive transactions are capitalized as costs of facilitating the transaction.

Section 165(a) provides that there shall be allowed as a deduction any uncompensated loss sustained during the taxable year.  Section 165(f) provides that capital losses are subject to the limitations in sections 1211 and 1212.

POSTN-133450-15                          4

Section 1211 provides that in the case of a corporation, losses from sales or exchanges of capital assets are limited to gains from such sales or exchanges.  Section 1212 provides for the carryover of excess capital losses.

In both *Situation 1* and *Situation 2*, under section 1221 Target's stock would be a capital asset in Acquirer's hands upon acquisition.  The Contract provides Acquirer with a bundle of rights vis-à-vis Target that relates to Acquirer's proposed acquisition of Target stock.  Although the Contract is between Acquirer and Target rather than between Acquirer and Target's shareholders, a contract between the acquiring corporation and the target corporation is a customary part of the process by which the stock of a publicly held corporation is acquired.  As discussed above, the Contract imposes obligations on both parties with respect to Target's stock.  The Contract also provides Acquirer with rights with respect to Target's stock.  The termination fee payable to Acquirer under the Contract is in the nature of liquidated damages rather than as compensation for services.  Consistent with the purpose of section 1234A, any gain or loss realized by Acquirer on the termination of the Contract, which provides rights and obligations with respect to Target's stock, a capital asset, would be capital in nature.

Based on these particular facts we conclude:

In *Situation 1*, Acquirer's amount realized from the receipt of the termination fee ($1,000,000) is reduced by Acquirer's capitalized facilitative costs ($200,000).  Because this gain was attributable to the termination of Acquirer's right with respect to Target's stock -- property that would have been a capital asset in Acquirer's hands -- the gain is treated as a gain from the sale of a capital asset under section 1234A.  Accordingly, Acquirer has a capital gain of $800,000 (the termination fee income of $1,000,000 less Acquirer's capitalized facilitative costs of $200,000).

In *Situation 2*, Acquirer's amount realized from the receipt of the termination fee ($1,000,000) is reduced by Acquirer's capitalized facilitative costs ($1,100,000), resulting in a loss of $100,000.  Because this loss was attributable to the termination of Acquirer's right with respect to Target's stock -- property that would have been a capital asset in Acquirer's hands -- the loss is treated as a loss from the sale of a capital asset under section 1234A.  Accordingly, Acquirer has a capital loss of $100,000 (the termination fee income of $1,000,000 less Acquirer's capitalized facilitative costs of $1,100,000) that Acquirer may deduct under section 165, subject to the limitations on capital losses in sections 1211 and 1212.

This advice applies only in the situations and under the facts and circumstances described herein.[1]  The label "termination fee" is not determinative, and the

---

[1] We note that the conclusion in this memorandum is contrary to the conclusion reached on similar facts in PLR 200823012, which held without explanation that the receipt of a termination fee like that in *Situation 1* resulted in ordinary income.

POSTN-133450-15                              5

specific provisions of the contract in question in a given case must be examined to determine the correct tax treatment.

Pursuant to section 6110(k)(3) of the Code, this document may not be used or cited as precedent.  Please call (202) 317-7003 if you have further questions.

# EXHIBIT D

**Office of Chief Counsel**
**Internal Revenue Service**

# Memorandum

Release Number: **20163701F**
Release Date: 9/9/2016

POSTF-109245-16

UILC:   1234A.00-00

date:   May 03, 2016

to:
Revenue Agent
(Large Business & International)

from:

(Large Business & International)

---

subject:

This memorandum responds to your request for assistance. This advice has been reviewed by Financial Institutions and Products in National Office. This advice may not be used or cited as precedent.

## DISCLOSURE STATEMENT

**This writing may contain privileged information. Any unauthorized disclosure of this writing may undermine our ability to protect the privileged information. If disclosure is determined to be necessary, please contact this office for our views.**

## ISSUE

Whether            (Taxpayer) payment of a break fee arising from the termination of an agreement of merger gives rise to a capital loss under section 1234A.

## CONCLUSION

POSTF-109245-16                          2

Yes. Under the circumstances discussed below, section 1234A applies to Taxpayer's loss arising from the payment of a break fee attributable to the termination of an agreement of merger, and the loss is a capital loss.

## FACTS[1]

On                    , Taxpayer announced in a press release the recommended combination of Taxpayer and             (Target), a
                    company organized under the laws of

Also on                    , Taxpayer and Target entered into a                Agreement that intended to give effect to the terms and conditions set forth in the press release recommending the merger.

To facilitate the merger, Taxpayer formed a new company,             , which is incorporated in         . Under the terms of the             Agreement, Target shareholders would be entitled to receive
                    . Taxpayer stockholders would receive
             . Both Taxpayer and Target would become
        subsidiaries of         , with             stock being listed on the
        Exchange.

The merger was conditioned upon Taxpayer's board recommending the merger to its shareholders. Before the transaction could be consummated, the U.S. Treasury Department issued a notice that adversely affected the expected tax benefits of the proposed merger. In             , Taxpayer withdrew its recommendation for the merger.

Under the             Agreement, Taxpayer was required to pay a break fee to Target if Taxpayer withdrew its recommendation for the merger. On             ,
Taxpayer and Target entered into a             Agreement to terminate the
        Agreement. The             Agreement provided that Taxpayer would pay Target the break fee because Taxpayer did withdraw its recommendation for merger. Taxpayer paid a break fee of $             to Target on

This break fee also operated as the Target's sole and exclusive remedy for the terminated merger.

---

[1] Our understanding of the facts of this case is limited to the information that you have provided to us unless otherwise stated. We have not undertaken any independent investigation of the facts of this case. If the facts known to us are incorrect or incomplete in any material respect, you should not rely on this advice, but instead should contact our office immediately.

During the                           , Taxpayer provided a copy of the wire transfer and
description of line item for this amount to be reflected in its        U.S return.

## LAW AND ANALYSIS

*Law*
Section 1222 provides that capital gain or loss is gain or loss from the sale or exchange
of a capital asset.

Section 1221(a) defines a capital asset as any property that is held by the taxpayer,
regardless of whether it is connected to the taxpayer's trade or business, unless it is
one of the exceptions listed under section 1221(a).

Section 1234A states that gain or loss attributable to the cancellation, lapse, expiration,
or other termination of a right or obligation (other than a securities futures contract) with
respect to property which is (or on acquisition would be) a capital asset in the hands of
the taxpayer shall be treated as gain or loss from the sale of a capital asset.

The law under section 1234A as it existed (prior to its amendment in 1997) was
deficient because "it taxes similar economic transactions differently," and "its lack of
certainty makes the tax laws unnecessarily difficult to administer." S. Rept. No. 105-33,
at 134, 1997-4 C.B. (Vol. 2) at 1214. The legislative history further provides that a
"major effect of the Committee bill would be to remove the effective ability of a taxpayer
to elect the character of gains and losses from certain transactions. Another significant
effect of the Committee bill would be to reduce the uncertainty concerning the tax
treatment of modifications of property rights." S. Rept. No. 105-33, at 135, 1997-4 C.B.
(Vol. 2) at 1215.

The explanation of section 1234A further provides  –

> The bill extends to all types of property the rule which treats gain or
> loss from the cancellation, lapse, expiration, or other termination of
> a right or obligation with respect to property which is (or on
> acquisition would be) a capital asset in the hands of the taxpayer
> [as capital gain or loss].. . . Thus, the committee bill will apply to (1)

POSTF-109245-16                              4

> interests in real property and (2) non-actively traded personal
> property.. . . An example of the second type of property interest that
> is affected by the committee bill is the forfeiture of a down payment
> under a contract to purchase stock. See *U.S. Freight Co. v. United
> States*, 422 F.2d 887 (Ct. Cl. 1970), holding that forfeiture was an
> ordinary loss.

S. Rept. No. 105-33, at 135, 1997-4 C.B. (Vol. 2) at 1215.

Section 165(a) provides that there shall be allowed as a deduction any uncompensated loss sustained during the taxable year. Section 165(f) provides that capital losses are subject to the limitations in sections 1211 and 1212. Section 1211 provides that in the case of a corporation, losses from sales or exchanges of capital assets are limited to gains from such sales or exchanges. Section 1212 provides for the carryover of excess capital losses.

*Analysis*

Section 1234A treats as gain or loss from the sale of a capital asset a "[g]ain or loss attributable to the cancellation, lapse, expiration, or other termination" of a right or obligation "with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer." A capital asset is any property that is held by the taxpayer, with eight exceptions listed in section 1221(a). Stock is generally considered a capital asset. *Appalachian Elec. Power Co. v. United States*, 158 F. Supp. 138, 140 (Ct. Cl. 1958).

                    stock would be a capital asset in Taxpayer's hands upon acquisition. Taxpayer and Target had entered into a                Agreement in which Taxpayer and Target each would acquire           stock. Furthermore, the          Agreement required Taxpayer and Target to obtain clearances in order to implement the merger. The             Agreement outlined a list of obligations that Taxpayer and Target would undertake, which consisted primarily of the respective parties providing

The contract thus provided Taxpayer with rights and obligations with respect to Target's and           stock.

Under the             Agreement, if Taxpayer makes an adverse recommendation change and the merger fails to go through, Taxpayer was required to pay a break fee to Target. Per the             Agreement and           Agreement, the break fee provision was for "

          " The break fee operated as Target's sole and exclusive remedy against Taxpayer and was in the nature of liquidated damages rather than as compensation for services.

POSTF-109245-16                        5

The break fee relates to a contractual right and obligation concerning a capital asset (the right and obligation to acquire            stock). Consistent with the purpose of section 1234A, any gain or loss realized by Taxpayer on the termination of the contract, which provides Taxpayer with rights and obligations with respect to

                                                                        stock, a capital asset, would be capital in nature. Therefore, section 1234A applies and Taxpayer's loss on paying the break fee is a capital loss.

This advice applies only in the situations and under the facts and circumstances described herein. Pursuant to section 6110(k)(3) of the Code, this document may not be used or cited as precedent. Please call                  if you have any further questions.


                                        Associate Area Counsel
                                        (Large Business & International)



                        By:   _____

                                        Attorney, (            )
                                        (Large Business & International)

# EXHIBIT E

Form **2848**
(Rev. January 2018)
Department of the Treasury
Internal Revenue Service

# Power of Attorney
# and Declaration of Representative

▶ Go to *www.irs.gov/Form2848* for instructions and the latest information.

OMB No. 1545-0150

| For IRS Use Only |
|---|
| Received by: |
| Name _____ |
| Telephone _____ |
| Function _____ |
| Date ___ / ___ / ___ |

**Part I**   **Power of Attorney**

**Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

**1**   **Taxpayer information.** Taxpayer must sign and date this form on page 2, line 7.

| Taxpayer name and address | Taxpayer identification number(s) |
|---|---|
| AbbVie Inc.<br>1 N. Waukegan Road<br>North Chicago, IL 60064 | 32-0375147 |
| | Daytime telephone number | Plan number (if applicable) |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2**   **Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | | |
|---|---|---|
| Daniel A. Rosen<br>Baker & McKenzie, LLP<br>452 Fifth Avenue, New York, NY 10018 | CAF No. | 0310-99756R |
| | PTIN | P01787930 |
| | Telephone No. | 212-626-4272 |
| | Fax No. | 212-310-1672 |
| Check if to be sent copies of notices and communications ☑ | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ | |
| Name and address<br>Robert H. Albaral<br>Baker & McKenzie, LLP<br>1900 North Pearl Street, Suite 1500, Dallas, TX 75201 | CAF No. | 03-0124252R |
| | PTIN | P01250061 |
| | Telephone No. | 214-978-3044 |
| | Fax No. | 214-965-5962 |
| Check if to be sent copies of notices and communications ☑ | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ | |
| Name and address<br>George M. Clarke, III<br>Baker & McKenzie, LLP<br>815 Connecticut Avenue NW, Washington, D.C. 20006 | CAF No. | |
| | PTIN | P01464225 |
| | Telephone No. | 202-835-6124 |
| | Fax No. | 202-416-7124 |
| (**Note:** IRS sends notices and communications to only two representatives.) | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ | |
| Name and address<br>Joy Williamson<br>Baker & McKenzie, LLP<br>1900 North Pearl Street, Suite 1500, Dallas, TX 75201 | CAF No. | 0309-66134R |
| | PTIN | P01615727 |
| | Telephone No. | 214-965-7239 |
| | Fax No. | 214-965-5905 |
| (**Note:** IRS sends notices and communications to only two representatives.) | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ | |

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3**   **Acts authorized (you are required to complete this line 3).** With the exception of the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts that I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower, Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 5000A Shared Responsibility Payment, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number (1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable) (see instructions) |
|---|---|---|
| Income | 1120 | 2014 |
| | | |
| | | |

**4**   **Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See the instructions for **Line 4. Specific Use Not Recorded on CAF** . . . . . . . . . . . . . . . . . ▶ ☐

**5a**   **Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information): ☐ Access my IRS records via an Intermediate Service Provider;
☐ Authorize disclosure to third parties;   ☐ Substitute or add representative(s);   ☐ Sign a return; _____
_____
_____
☐ Other acts authorized: _____
_____

For Privacy Act and Paperwork Reduction Act Notice, see the instructions.     Cat. No. 11980J     Form **2848** (Rev.1-2018)

Form 2848 (Rev. 1-2018) | Page **2**

**b** **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.

List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): -----------------------------

-----------------------------------------------------------------------------------------------------------------------

**6** **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this document. If you **do not** want to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . . . . . . . ▶ ☑

**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**7** **Signature of taxpayer.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the legal authority to execute this form on behalf of the taxpayer.

▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| | | |
|---|---|---|
| | 05/18/22 | Vice President, Tax |
| Signature | Date | Title (if applicable) |
| Lindsey Bristow | AbbVie Inc. | |
| Print Name | Print name of taxpayer from line 1 if other than individual | |

**Part II** | **Declaration of Representative**

Under penalties of perjury, by my signature below I declare that:

• I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;

• I am subject to regulations contained in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;

• I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and

• I am one of the following:

**a** Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.

**b** Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.

**c** Enrolled Agent—enrolled as an agent by the Internal Revenue Service per the requirements of Circular 230.

**d** Officer—a bona fide officer of the taxpayer organization.

**e** Full-Time Employee—a full-time employee of the taxpayer.

**f** Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).

**g** Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Internal Revenue Service is limited by section 10.3(d) of Circular 230).

**h** Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). *See Special Rules and Requirements for Unenrolled Return Preparers in the instructions for additional information.*

**k** Qualifying Student—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student working in an LITC or STCP. See instructions for Part II for additional information and requirements.

**r** Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**

**Note:** For designations d-f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter **(a–r)**. | Licensing jurisdiction (State) or other licensing authority (if applicable) | Bar, license, certification, registration, or enrollment number (if applicable) | Signature | Date |
|---|---|---|---|---|
| a | NY | 2790442 | | 5/18/2022 |
| a | TX | 00969175 | | 5/18/2022 |
| a | DC | 480073 | | 5/18/2022 |
| a | TX | 24088652 | | 5/18/2022 |
| | | | | |

Form **2848** (Rev. 1-2018)

AbbVie  Inc.
No. 32-0375147
Power of Attorney (Form 2848)
Addendum (Page 1)

**Part I: Box 2. Additional Representative(s)**

| Name and address | CAF. No. | 0306-21588R |
|---|---|---|
| Glenn Woll | PTIN. | P01231737 |
| Baker & McKenzie LLP | Telephone No. | 212-891-3533 |
| 452 Fifth Avenue | Fax No. | 212-310-1633 |
| New York, NY 10018 | | |
| **Name and address** | **CAF. No.** | 0310-90938R |
| Lucy J. Alberto | PTIN. | P01287347 |
| Baker & McKenzie LLP | Telephone No. | 212-626-4954 |
| 452 Fifth Avenue | Fax No. | 212-310-1749 |
| New York, NY 10018 | | |
| **Name and address** | **CAF. No.** | 0314-00281R |
| Nicholas O'Brien | PTIN. | P02340059 |
| Baker & McKenzie LLP | Telephone No. | 212-626-4946 |
| 452 Fifth Avenue | Fax No. | 212-310-1787 |
| New York, NY 10018 | | |


AbbVie  Inc.
No. 32-0375147
Power of Attorney (Form 2848)
Addendum (Page 2)

**Part II: Declaration of Representative**

| Designation | Jurisdiction | License | Signature | Date |
|---|---|---|---|---|
| a | NY | 2928885 |  | 5/18/22 |
| a | NY | 4544649 |  | 5/18/22 |
| a | NY | 5748082 |  | 5/18/22 |

| Form **2848** | **Power of Attorney** | OMB No. 1545-0150 |
|---|---|---|

**Form 2848**
(Rev. January 2018)
Department of the Treasury
Internal Revenue Service

**Power of Attorney
and Declaration of Representative**

▶ Go to *www.irs.gov/Form2848* for instructions and the latest information.

OMB No. 1545-0150

**For IRS Use Only**
Received by:
Name _____
Telephone _____
Function _____
Date ___ / ___ / ___

**Part I   Power of Attorney**

**Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

**1   Taxpayer information.** Taxpayer must sign and date this form on page 2, line 7.

| Taxpayer name and address | Taxpayer identification number(s) |
|---|---|
| AbbVie Inc.<br>1 North Waukegan Road, Dept V367, Bldg AP 34-3N<br>North Chicago, IL  60064 | 32-0375147 |
| | Daytime telephone number: 847-932-7000    Plan number (if applicable) |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2   Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | |
|---|---|
| Matthew Houchens<br>1 North Waukegan Road, Dept V367, Bldg AP 34-3N<br>North Chicago, IL  60064 | CAF No. 0300-71701R<br>PTIN _____<br>Telephone No. 847-935-5793<br>Fax No. 847-936-3039 |
| Check if to be sent copies of notices and communications ☑ | Check if new: Address ☑  Telephone No. ☑  Fax No. ☑ |

Name and address _____
CAF No. ____ PTIN ____ Telephone No. ____ Fax No. ____
Check if to be sent copies of notices and communications ☐   Check if new: Address ☐  Telephone No. ☐  Fax No. ☐

Name and address _____
CAF No. ____ PTIN ____ Telephone No. ____ Fax No. ____
(Note: IRS sends notices and communications to only two representatives.)   Check if new: Address ☐  Telephone No. ☐  Fax No. ☐

Name and address _____
CAF No. ____ PTIN ____ Telephone No. ____ Fax No. ____
(Note: IRS sends notices and communications to only two representatives.)   Check if new: Address ☐  Telephone No. ☐  Fax No. ☐

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3   Acts authorized (you are required to complete this line 3).** With the exception of the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts that I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower, Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 5000A Shared Responsibility Payment, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number (1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable) (see instructions) |
|---|---|---|
| Income | 1120 | 2014-2023 |
| Excise/Withholding | 720,1042 | 2014 - 2023 |
| Employment/Civil Penalty | 941,940, CP504 | 2014 - 2023 |

**4   Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See the instructions for **Line 4. Specific Use Not Recorded on CAF** . . . . . . . . . . . . . . . ▶ ☐

**5a   Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information): ☐ Access my IRS records via an Intermediate Service Provider;
☐ Authorize disclosure to third parties;  ☐ Substitute or add representative(s);  ☐ Sign a return; _____

☐ Other acts authorized: _____

For Privacy Act and Paperwork Reduction Act Notice, see the instructions.    Cat. No. 11980J    Form **2848** (Rev.1-2018)

Form 2848 (Rev. 1-2018)      Page **2**

**b**   **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.

List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): Not authorized to sign any agreements, consents, or documents.

**6**   **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this document. If you **do not** want to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**7**   **Signature of taxpayer.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the legal authority to execute this form on behalf of the taxpayer.

▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| _Signature_ | _Date_ 11/9/2020 | _Title (if applicable)_ Vice President, Tax and Treasury |

| Scott T. Reents | |
| _Print Name_ | _Print name of taxpayer from line 1 if other than individual_ AbbVie Inc. |

## Part II   Declaration of Representative

Under penalties of perjury, by my signature below I declare that:

- I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;
- I am subject to regulations contained in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;
- I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and
- I am one of the following:

**a** Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
**b** Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.
**c** Enrolled Agent—enrolled as an agent by the Internal Revenue Service per the requirements of Circular 230.
**d** Officer—a bona fide officer of the taxpayer organization.
**e** Full-Time Employee—a full-time employee of the taxpayer.
**f** Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).
**g** Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Internal Revenue Service is limited by section 10.3(d) of Circular 230).
**h** Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). *See Special Rules and Requirements for Unenrolled Return Preparers in the instructions for additional information.*
**k** Qualifying Student—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student working in an LITC or STCP. See instructions for Part II for additional information and requirements.
**r** Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**

**Note:** For designations d-f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter (a–r). | Licensing jurisdiction (State) or other licensing authority (if applicable). | Bar, license, certification, registration, or enrollment number (if applicable). | Signature | Date |
|---|---|---|---|---|
| a | IL | 6243145 | | 1/8/2020 |
| | | | | |
| | | | | |
| | | | | |

Form **2848** (Rev. 1-2018)

| Form **2848** | | **Power of Attorney** | | OMB No. 1545-0150 |
|---|---|---|---|---|

| Form **2848** (Rev. February 2020) Department of the Treasury Internal Revenue Service | **Power of Attorney and Declaration of Representative** ▶ Go to *www.irs.gov/Form2848* for instructions and the latest information. | OMB No. 1545-0150 |
|---|---|---|

**For IRS Use Only**
Received by:
Name _____
Telephone _____
Function _____
Date ___ / ___ / ___

**Part I**   **Power of Attorney**

**Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

**1   Taxpayer information.** Taxpayer must sign and date this form on page 2, line 7.

| Taxpayer name and address | Taxpayer identification number(s) |
|---|---|
| AbbVie Inc. 1 North Waukegan Road, Dept V367, Bldg AP 34-2 North Chicago, IL  60064 | 32-0375147 |

| Daytime telephone number | Plan number (if applicable) |
|---|---|
| 847-932-7900 | |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2   Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | |
|---|---|
| David L. Forst Fenwick & West LLP 801 California Street, Mountain View, CA 94041 **Check if to be sent copies of notices and communications** ☐ | CAF No.   0200-36623R PTIN ---------------- Telephone No.   (650) 335-7254 Fax No.   (650) 938-5200 |

Check if new: Address ☐   Telephone No. ☐   Fax No. ☐

| Name and address | |
|---|---|
| Michael D.Knobler Fenwick & West LLP 801 California Street, Mountain View, CA 94041 **Check if to be sent copies of notices and communications** ☐ | CAF No.   0312-49812R PTIN ---------------- Telephone No.   (650) 335-7717 Fax No.   (650) 938-5200 |

Check if new: Address ☐   Telephone No. ☐   Fax No. ☐

| Name and address | |
|---|---|
| Kristofer Hatch Fenwick & West LLP 801 California Street, Mountain View, CA 94041 **(Note:** IRS sends notices and communications to only two representatives.) | CAF No.   NONE PTIN ---------------- Telephone No.   (650) 335-7882 Fax No.   (650) 938-5200 |

Check if new: Address ☐   Telephone No. ☐   Fax No. ☐

| Name and address | |
|---|---|
| | CAF No. ---------------- PTIN ---------------- Telephone No. ---------------- Fax No. ---------------- |

**(Note:** IRS sends notices and communications to only two representatives.)   Check if new: Address ☐   Telephone No. ☐   Fax No. ☐

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3   Acts authorized (you are required to complete this line 3).** With the exception of the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts that I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower, Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number (1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable) (see instructions) |
|---|---|---|
| Income - Appeals proceeding | 1120 | 2014 |
| | | |
| | | |

**4   Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See *Line 4. Specific Use Not Recorded on CAF* in the instructions  . . . . . . . . . . . . . . . .  ▶ ☐

**5a   Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information): ☐ Access my IRS records via an Intermediate Service Provider;
☐ Authorize disclosure to third parties;   ☐ Substitute or add representative(s);   ☐ Sign a return;
_____
_____

☐ Other acts authorized: _____

**For Privacy Act and Paperwork Reduction Act Notice, see the instructions.**    Cat. No. 11980J    Form **2848** (Rev. 2-2020)

Form 2848 (Rev. 2-2020)                                                                                                      Page **2**

**b**  **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.
List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): ------------------------

**6**  **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this document. If you **do not** want to revoke a prior power of attorney, check here  ▶  ☑
**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**7**  **Signature of taxpayer.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative (or designated individual, if applicable), executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the legal authority to execute this form on behalf of the taxpayer.
▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| Signature | Date | Title (if applicable) |
|---|---|---|
| *(signature)* | 9/14/2020 | Vice President, Tax |

Lindsey Bristow
Print name                                                          Print name of taxpayer from line 1 if other than individual

## Part II    Declaration of Representative

Under penalties of perjury, by my signature below I declare that:

• I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;
• I am subject to regulations contained in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;
• I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and
• I am one of the following:

  **a** Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
  **b** Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.
  **c** Enrolled Agent—enrolled as an agent by the IRS per the requirements of Circular 230.
  **d** Officer—a bona fide officer of the taxpayer organization.
  **e** Full-Time Employee—a full-time employee of the taxpayer.
  **f** Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).
  **g** Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the IRS is limited by section 10.3(d) of Circular 230).
  **h** Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). *See Special Rules and Requirements for Unenrolled Return Preparers in the instructions for additional information.*
  **k** Qualifying Student—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student working in an LITC or STCP. See instructions for Part II for additional information and requirements.
  **r** Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**

**Note:** For designations d–f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter (a–r). | Licensing jurisdiction (State) or other licensing authority (if applicable) | Bar, license, certification, registration, or enrollment number (if applicable) | Signature | Date |
|---|---|---|---|---|
| a | CA | 165385 | *(signature)* | 9/10/2020 |
| a | CA | 287701 | *(signature)* | 9/10/2020 |
| a | CA | 324078 | *(signature) K. Hatch* | 9/10/2020 |
|  |  |  |  |  |
|  |  |  |  |  |

Form **2848** (Rev. 2-2020)

# EXHIBIT F

# NEW YORK STATE

## DRIVER LICENSE

### ENHANCED

USA

*Mark JF Schroeder*
Commissioner of Motor Vehicles

ID **445 257 493**

Class **D**

ROSEN
DANIEL,ALLEN

Sex **M**   Height **5'-06"**   Eyes **BRO**

DOB **03/04/1969**

Expires **03/04/2029**

E **NONE**

R **B**

Issued **02/24/2021**

MAR 69

EXCELSIOR

## Sponheimer, Brendan

**From:**      BakerFax@BakerMcKenzie.com
**Sent:**      Thursday, December 22, 2022 7:14 PM
**To:**        Silver, Glenn
**Subject:**   Your fax has been successfully sent to Freedom of Information Act Coordinator at
               91877-807-9215.


Your fax has been successfully sent to Freedom of Information Act Coordinator at 91877-807-9215.
-------------------------------------------------------------
From: Brendan Sponheimer
Account: 10005339
Matter: 50064683-0000
-------------------------------------------------------------
12/22/2022 5:51:09 PM Transmission Record
        Sent to 6756918778079215@10.64.113.4 with remote ID ""
        Result: (0/339;0/0) Success
        Page record: 1 - 72
        Elapsed time: 22:45 on channel 0

1